Good morning, Your Honors. May it please the Court, Samuel Joseph on behalf of Appellant Samuel Anthony Eaton. I'll be handling the fire issue. And if it's okay with the Court, I'd like to devote ten minutes to that issue and reserve two minutes for rebuttal. And then your co-counsel is going to argue the other issues in eight minutes? The other issues in the other ten minutes. I would like just ten minutes. You're having ten minutes, eight for opening and two for rebuttal. Correct. All right. Thank you, Your Honor. Mr. Eaton received a 30-year mandatory minimum sentence under a statute that's never been applied to a case like this. Without the statutory enhancements, the district court stated that it would have sentenced Mr. Eaton to five years. We'd ask the Court to vacate the counts that enhanced Mr. Eaton's sentence based on the use of fire and remand to the district court for resentencing on the remaining counts. There are two issues that I'd like to address with the Court. The first is why this lance cutter isn't the use of fire under the statute. And the second, the related issue, is why this statute was never meant to apply to a case like this. On the first issue, of course, this Court's analysis starts with the text, but also with a common-sense understanding of what it is to use fire. And the term fire can't be divorced from the words in the statute. When we think of a common-sense understanding of what it is to use fire, we don't think of cutting things open. And, in fact, that's exactly what the government charged Mr. Eaton with doing, is cutting open an ATM machine. It wasn't until the answering brief in this case that the government started to characterize the conduct, in this case, as burning something open. And I would submit that burning something open is certainly not a common-sense understanding of how we think of fire. Well, how do you burn something? I think you burn something with excessive heat, which – but, again, I think it's important to keep in mind that the indictment in this case, and what Mr. Eaton was charged with all along, was cutting open these ATM machines. And not until we got to this stage on appeal did the government start to morph the facts of this case into something that maybe we more commonly understand with fire. I think it's important, though, that even if this Court were to find that this was fire, that the second issue, perhaps the bigger issue, is that this is a statute that was never meant to apply to facts like this, to a case like this. This is a statute that inserted the word fire into 844-H1 in 1982 under the Anti-Arson Act. The entire premise of the Anti-Arson Act was to allow the federal government to more easily prosecute arson. It wasn't until – But even before we go to the History Council, I mean, don't we just look at the language? We do. We start with the – And if you look at it, it says that this statute punishes a person who, quote, uses fire or an explosive to commit any felony, which may be prosecuted in a court of the United States. So the question, I think, and I'm curious, you said even if it is fire, how? Because I know you're challenging whether this is fire or not, but even if it is fire, how is this not appropriate use of this statute in light of the facts of this case? Certainly, Your Honor. I think there are two answers to that. One is that we still need to define what it is to use fire under the plain meaning of the statute. And I would go back in that with how we commonly understand what it is to use fire. And I think if you look at the cases, every single case that's charged in this statute uses fire in the way that we commonly understand using fire, in the arson context, blowing things up or burning things down to the point where there are just ashes left. Using fire in that common-sense understanding is not normally – we don't normally think of cutting something open. I think also, even under the plain meaning, we're still looking at these words in relation to one another. It's not simply – and I think that goes back to sort of the issue of whether or not this was fire to begin with. There's still the issue of whether just heat in this example, just something that causes extreme heat and has the ability to melt something, is fire as it was meant under the statute. You don't get around the problem of what the intent of the statute is simply by looking to the plain meaning. Understanding the plain meaning of the statute still means that one needs to look at the statutory purpose, that is, the intent of Congress in passing the statute to begin with. But with that, I do think that it's significant also that we would look at the statutory history, the legislative history, under an analysis that looks at a plain reading of the statute would clearly lead to unreasonable or absurd results. And I think in our papers, we pointed out a number of statutes that would apply under the government's plain reading that clearly would be absurd to apply the statute to. And I think that is actually where the Graham case comes in. The Second Circuit recently held in Graham on – the statute also, as the Court knows, includes the word explosive. And so it's to use fire or an explosive to commit any felony. And the government's reading is that, as the Court mentioned, that would apply in any situation where either one of those things was used. Graham is an interesting case because in Graham, the Court says even if this was technically an explosion – and again, to refresh the Court, in Graham, there was a discharge of a firearm in furtherance of an extortion conspiracy. And there was an ATF official, an ATF agent, that testified in Graham in front of a jury that the discharge of a firearm from a – the discharge of a cartridge from a firearm is a mini-explosion. And the Graham court essentially said even if it is an explosion, even if technically this was under the plain meaning of the statute an explosion, clearly Congress didn't intend for this statute to apply in a situation like this. And it pointed out some absurd results that we pointed out as well. One of the examples was the internal combustion engine. The Graham court pointed out that the getaway driver in a robbery would technically fit under the government's definition because of the mini-explosion that takes place in an internal combustion engine. I think that's certainly significant. But also, the four or five statutes that we offer to the Court, they also would satisfy the government's definition. One of those, I think, a common example that we see in the Federal courts is manufacturing methamphetamine or crack cocaine clearly uses fire in that process. And therefore, every single time an individual would manufacture methamphetamine or crack cocaine using fire, under the government's reading, the statute would apply. Aren't you the argument that you're trying to make is that fire has to be used for destructive purposes in order to be covered by 844-H1? I think it's the certainly the way that fire is used has to be in the context of arson or at least, at the very least, and I know there is some disagreement in the circuits as to whether this applies outside of the arson context, for example, in the cross-burning context. In the cross-burning cases, though, we still have a situation where there is destruction. There is clearly a large-scale fire being set. And there is all of the dangers that entail with that fire being set. For example, both in Hayward and Wild, the two cross-burning cases, the fire department was called in both of those cases because of the large-scale risk, essentially, of what the fire was going to do. In one case in Hayward, I believe it was a huge burning cross was up against a tree. In Wild, it was up against a fence. In both of those cases, I think we're still talking about all the attendant risks of what we normally think of with fire, which is what we see every single time this statute, 844-H, is charged. It's in the context of some large-scale destruction or some large-scale danger that's placed to human lives. And I actually think it's instructive to look at a couple of the definitions of arson, which I think help to answer the Court's question. Why does it have to be arson? I mean, I know the history of the statute. But if you're looking at the plain meaning of the thing, if you look at it in the context of subsection E, which says using mail or a telephone to threaten or injury or destruction of property by means of fire, subsection F1, the malicious damage or destruction of property owned by the United States, subsection I, malicious destruction of property by fire, it seems like if you read the statute in the context of what is written, it means using fire to destroy something, in which case your argument is they were not using fire to destroy something in the sense of burning it. They were using it to gain access. I think that's correct, Your Honor. I think we do. I think we do. And the government has never suggested that this was the malicious destruction of property as arson is normally defined. The government has certainly pointed to some of the consequences of what occurred to the ATM machine itself or to the fact that there was some smoke, some char in the room. But certainly the government has never called this an arson case. And I think the government isn't being heard, so I do think the print school  And if it's something in which the E'd Rather H deals with domestic violence,  And I think that the judges have to have that looked at and I judge that, you know, most of the judges say, no, but 854-b files rules against us. And I think we have to have an in-general Reading paper looking at this. And I think that's correct. The case where 844-h is applied, almost all of those cases, I is applied as well. And the idea is that somebody has committed arson, somebody has destroyed a building, a vessel, the destruction of property, in order to commit an additional felony, and that's where I, excuse me, that's where H comes into play. And I think this Court's decision in Carleck makes that point exactly. Carleck is the double jeopardy case saying that I and H are not duplicative. And the idea is that both can be charged in the same case, as long as there is an element present in addition to just the arson. That would be an additional felony that would be committed by the act of arson itself. And other — But you say that 844-h1 can never just be charged by itself. 844-h is always charged in addition to some other felony. The statute itself says that it's the use of fire to commit a felony. So the government charges the felony, the underlying felony. But you're saying it has to be combined with the arson. I'm trying to understand, because this was a bank larceny, right? Certainly. So — I'm not saying that the — that every single case has to charge I. But I am saying that the facts of every single case is a case where I comes into play. And some of the examples that we pointed where I isn't charged are examples where the jurisdictional hook for Federal arson wouldn't be satisfied. How about the Second Circuit D'Esposito case? What do you say about that? Certainly. D'Esposito is exactly the types of cases that we've seen throughout the circuits charging somebody who's destroyed property. And in that case, they set a fire in a vehicle, I believe it was a car, in order to distract law enforcement from them going into a bank. D'Esposito is exactly the types of fires and explosions that occur in all of these — I don't think it adds anything new to the case law. They actually don't even talk about Graham. If they'd used a thermal lance to start that car fire, would that have been — could the government have proceeded? I think it — I think it depends. I think what the Court is — Give me the best yes or no. Give me a yes or no. I think they could have. The reason — Here, the thermal lance was used as an integral part of this offense. I mean, they didn't use it to light another car to distract. They used it to actually get into the ATM machine. Looks like somebody else was using one of — I don't think it's disputed — one of the co-defendants was using water so that the money wouldn't burn. Looks like there was smoke and what would ordinarily be fire to burn it. And so I'm just trying to get my mind around your argument that somehow this couldn't be used for this particular case. I think the distinction in the Court's example is that in the car example, where a thermal lance would be used to set fire to a car, is the primary purpose in that case is to — is to start a fire, to create a fire. All of the risks and problems that go along with fire in that instance are present. All the risks that we see in arson cases. In our case, we're talking about a situation where the individual has actively tried to prevent a fire from occurring. And it's the use of this tool to cut open an ATM machine. Well, they didn't do a very good job of preventing a fire because some of the money did burn. There was smoke. Everybody came in and said there's smoke. You could smell smoke and everything that looked like residue from a fire. I'm curious. Down below, it looks like no instruction was given, a definitional instruction of fire. That's correct. It was discussed, apparently. That's correct. But both of the parties said no. It was agreed to, that the jury would decide. Is that correct? There was no jury instruction. And there was no objection to what ended up happening. Is that correct? Or did I recall that incorrectly? Well, Your Honor, I'd say the objections were in the form of a Rule 29. That this should never have been a matter of issue. Let's get before the Rule 29. When this, at the charge conference, when this went to the, my recollection, and I have a lot of cases here, I might be wrong. But I thought that everybody agreed. Let's let the jury decide if this was fire. They looked at all of the evidence and decided under the common meaning, or their understanding, their common sense understanding, that apparently they decided that it was because the individuals were convicted. Is that correct? That is correct. But the reason why I don't think that's dispositive in this case is a couple of reasons. Number one, the issue that we're making that was preserved, certainly, in the motion to dismiss, as well as in the Rule 29, is this is an issue that never should have gone to the jury. I think the Graham case is a point about that. Graham had the exact same situation of deciding whether or not what the government presented was use of an explosive, and the jury decided that it was. And the court didn't defer to that jury finding. The court said that this is an issue that should not have gone to the jury in the first place. I think this court has done the same thing in the context of the federal assault statute, in the Roka case. The Roka case was a case where the government charged that use of somebody's hands, bare hands, can be a dangerous weapon. And this court's precedent had always established that what a dangerous weapon was, was a matter decided by the jury. The Roka court said that in this particular situation, somebody's hands didn't fit, as a matter of statutory interpretation, a dangerous weapon, and therefore, took that issue away from the jury in that particular case. I would like to reserve my remaining time. Good morning, your honors. Gretchen Fusilier on behalf of Appellant Mr. Dawson. I'm going to argue the insufficiency of the evidence to convict him of the conspiracy. The government relies on several factors that it indicates meets the standard to convict for conspiracy. Those elements are the presence of Mr. Dawson at the Denny's, which was in the vicinity, the general vicinity of the federal credit union, or the credit union that had been the subject of the larceny. That he had remained in the area after he had been spoken with by the police, and that he apparently had the thermal lance in the bed of his truck. Those three indications do not meet the sufficiency of the evidence. It is more of a discounting of the qualitative requirements that the review requires, rather than finding the essence of some actual participation and some conduct that was integral to the completion of the bank larceny. Here, we don't have that. In essence, the government, in its brief, indicates that Mr. Thompson had placed the thermal lance into the truck bed of Mr. Dawson, and Dawson had indicated that the tools that were found in his truck were consistent with his position as a diesel truck mechanic. If we look at just that, we have the testimony of the employee at Denny's who actually called the police. Her testimony indicated that there were two vehicles, two cars, in the parking lot of Denny's, and people were transferring undisclosed or unidentifiable objects from one trunk to the other. Well, it's clear that Mr. Dawson's truck did not have a trunk, but had a bed. At some point when he left, I believe that that is more construed as maybe staying in the area, not to contribute to the bank larceny subsequent to his departure from the Denny's area, because there is no cell phone tracking of him actually being at the bank. There is no cell tracking of his actually being in the same location as either Mr. Eaton or Williams. Were there 45 phone calls from Mr. Dawson to Mr. Eaton at the time of the bank larceny? The cell records do indicate that there were many cell calls between Dawson's cell phone, telephone number, and Eaton's. However, I think that falls more along the lines of cases, which indicate that association with people who are- But his function was to be a lookout, right? Well, Your Honor, there's no indication that he was ever close enough to the bank to be a lookout. And in essence, if he is approximately five miles, which the government's witness testified to the cell records, those cell records were not real-time tracking, but they based a location off of the GPS system once the latitude and longitude had been determined after the fact. So we don't have Mr. Dawson at the location of the bank to have functioned as a lookout. And in fact, Mr. Thompson indicated that he was going to be the lookout, as well as having brought the thermal lance and brought the breaker bar that he had purchased. So when we scrutinize the evidence more, we have a situation more in line with the cases that Mr. Dawson was in fact associating with people who had committed an offense that night. There is nothing that he had done, no evidence that he had done anything that was so integral that once he left, it was- Well, he lied to the police when they inquired about the, I think it was the hammer and the thermal lance, I think it was, which if he hadn't have lied to the police, might have stopped the whole thing. But he didn't, the lying to the police allowed this whole scheme to proceed? Your Honor, that might have more to do with whether or not he withdrew, but I don't think that- Well, he would have withdrawn if he would have said to the police, oh, you know what's going on here, I need to report to you, or, you know, what's happening here. How do you think he would have withdrawn? I mean, I don't think the overt act was required here. No, an overt act was not required. However, when one speaks of withdrawal, even with the Smith case that the government cited, recently decided by the U.S. Supreme Court, that spoke to shifting the burden of proof once the prima facie case of withdrawal has been developed as a defense,  However, withdrawal would still, it's our position, exonerate Mr. Dawson from any post-withdrawal criminal liability. And the fact that there was no evidence that Mr. Dawson had done anything that was so integral that once he left, it was inevitable that the bank larceny was going to go forward. And that is something that the cases rely on, and certainly that was not the case with Mr. Dawson. Thank you. Thank you. I would submit it. Good morning, Mark Gannis for Mr. Thompson. I wanted to say something quickly about the fire issue, and I think it's been mentioned before in the briefing, but it seems that there's a difference between a significant risk of a fire being caused versus the use of fire. And that seems to be an important distinction here, is that there is a great risk of fire by using this type of device. But the defendants knew that, and they did as much as they could to avoid fire from cropping up. What they wanted was to use the heat to cut the ATM, and they didn't want fire. So it was something they avoided, and it seems to be the opposite. But there's no doubt that if this were a standard, a reckless or a negligent standard for the use of fire, then they may be guilty. But intentionally using fire to affect this crime, I don't think it reaches that level. As to withdrawal, I think that the briefs pretty well set that out. But I will say that as to Mr. Thompson, he did quite a bit to show that he was withdrawing from the conspiracy, and that he left after the police came. He called everybody. He made it pretty clear that he was out of the crime. And he never did anything. He didn't go forth with being the lookout. Another defendant testified that he did, but of course that's a fact issue. The jury would decide. So it seems that there is enough for this question to have gone to the jury on withdrawal. And with that, are there any questions? Thank you, Counsel. Thank you. Good morning. May it please the Court. Justin Rhodes and Lena Morton Owens on behalf of the United States of America. The appellants direct this Court to decades-old congressional records in hopes that you don't focus on what are the undisputed facts of this case. And those facts are that the appellants used a 10,000 degree Fahrenheit cutting torch to burn open bank automatic teller machines to commit larceny. What they also don't have you focus on is the fact that in doing so, they damaged or destroyed those very same automatic teller machines. Judge Molloy brought up some interesting issues about whether or not damage or destruction is required. I would submit to you, and I think government's excerpts of record 901 to 905, which are color copies of photographs of those machines, show that damage and destruction did occur. Now, damage and destruction is not required under Section H1 of the statute. It is under E and F and I. But even if the Court were to conclude that somehow arson should be read into the Section H1 and its damage and destruction requirement, those machines were undeniably damaged. Another thing that the appellants don't talk about is that Mr. Eaton had been doing this before. As set forth in his PSR, he had been committing thermal lance larcenies for several years. In one example, before he learned to use the water sprayer, he actually destroyed an entire strip mall that had to be razed and rebuilt at a cost of $600,000. Well, did you charge him with the H1 violation there? He was not charged there, Your Honor. This is the first time. That probably would have been a good charge. But is this a stretch? I mean, I don't understand how this thermal device is fire. Your Honor, I think that was the next point I was going to get to. What I think that the Court should look at specifically is the chemical reaction that's involved here. I submit to you the prototypical example of fire is a wooden kitchen match. It has a tip that can be ignited. It has a wooden matchstick that burns down. That wood provides the fuel for the fire. And it requires oxygen. If you take away oxygen, it stops burning. And it produces light, heat, and smoke. There is no difference between a wooden matchstick and a thermal lance. It has a tip that is ignited. It uses the disposable rods that burn down as the process goes on. It requires oxygen. And at the same time, it produces light, heat, and smoke. Will a match burn underwater? A match will not burn underwater. Will the thermal device? Certain versions of them will under the right conditions. And one of the reasons, I believe, and it may not be in the record, but there's enough oxygen being forced from the tank through which creates oxygen which allows the continued reaction. But at the point where the lance makes contact with the metal, something else that the appellants don't discuss is that the metal is actually burning. The science involved in this, and there are several books that were submitted to you as part of the government's brief that describe the reaction. It's a chemical reaction that around 7,200 degrees Fahrenheit, steel will burn. Now, there are materials on earth that are not combustible. Concrete is one of them. But steel will burn. And when a 10,000-degree cutting torch is applied to steel, at that moment, the steel is burning. This device is used regularly for legitimate purposes, isn't it? To destroy a car or to chop up a car? Yes, Your Honor. And if that were a crime, if it were a government car, the use of this would fall under the statute? No, Your Honor. And I think that's the issue that the appellants rely most heavily on, in addition to the legislative history, is where is the line to be drawn? And in this case, I wouldn't... Well, why isn't it that it would be the same kind of a crime to destroy a government car that way? Well, if you set it on fire, you mean? No, you just chop it up this way. Isn't that what it's used for normally, to chop up a car? It can. And if you were destroying a government car without authorization, you could be charged with, and you use the torch, you could be charged with 844I, which is the arson statute. You know, there's a question whether or not, you know, how the car was, arson is specific and it's how the car was being used. But if it was being used according to 844I, you could be charged with that. In addition, I submit, you could be charged with 844H1, which is the use of fire. And I understand that that, what this does is it draws instances where the court must draw lines. And I submit to you that when you are using the hottest fire known to man to burn open a machine for the purpose of committing what is undeniably a felony, that that is the use of fire. Let me ask, when you cook meth, what do you, you cook it with a, on a stove where you heat it through the flames? You could, you could use that. I assume you could also do it on an electric burner. I don't. And it would be a normal crime if you used an electric stove. But if you used the gas stove, it would fall under these sections. Your Honor, I don't think that that, first of all, an issue not before the Court. But I think that that is not the use of fire. I think fire there is. Well, why not? That's what I'd like to understand. I understand, Your Honor. A fire there is incidental. You could do that, again, with an electric stove. The fire is not the, the tool that is being used for the purpose. The crime is not based around the fire. And, you know, again, if you wanted to talk about the purpose of the statute, you know, and look at the legislative history, which I submit you don't have to do because it is plain on its face. But the concern is fire and explosives are both things that can cause unintended consequences and damage and destruction and danger to human life. And a cooktop, as we know it, does not do that. The same way that using, in the Hayward case, using a cigarette lighter to look into a lock to see if you could pick it doesn't have the same damage and destruction potential that a 10,000-degree torch does. And I think that looking at what happened to these machines and the strip mall that Mr. Eaton burned down shows that this is that example. This is the place where fire has the unintended consequences. And I would submit to you, if the Court will indulge me, a very brief three-part hypothetical. If you have a bank that is entirely made out of wood and inside you have a metal safe, if the appellants came up and held the thermal lance to the side of the bank and burned it to the ground and walked in and opened the safe, that's Part 1. Now, Part 2, imagine, if you will, a bank made out of brick with a wooden door. The appellants hold the thermal lance to the wooden door until it catches fire, burns down, and step inside and open up the safe. And then Part 3 is a bank made out of brick with a metal door. They hold the thermal lance to the door. At the moment where the hinges, the thermal lance is touching the hinges, it is burning that steel. They wait for the hinges to fall off, the door opens, and they go in and they withdraw the money. I don't think the appellants would disagree that the first example is undeniably the use of fire. And if that first example where they burn the bank to get inside is the use of fire, then how is it that burning the door open, again, combustible material, just material that happens to burn at a different temperature is not the use of fire? Maybe because the bank didn't burn buildings around it because only the door is on fire. But I would submit another point that came up is, I think Mr. Thompson's counsel mentioned this, they were, he said they were trying to prevent fire. Under that circumstance, if I set my neighbor's house on fire for the purpose of committing a crime and stood at the property line with my hose to make sure the fire didn't come onto my property, I don't think anyone would say that because I was trying to prevent the fire from spreading that I was therefore not using fire. The appellants were hoping that the money didn't burn. They wanted very desperately to burn the door, to burn that steel. And the only tool that they could use to burn that steel is a 10,000-degree cutting torch. Well, they wanted very desperately to get into the ATM. Yes. Not necessarily to burn their way. If they could have figured out some other way, I assume they would have done it. But this was the best way to get in. But there was no flame or fire in the usual terminology that we all understand fire, was there? I think there was, Your Honor. So there was flames here. There is flame. The record does indicate that there is flame. And we submitted to the court a DVD that shows the operation of a typical thermal lance. It's hard to see because the very tip is burning so brightly that it's hard to see the flame. But Detective Black, who was the expert for the government, testified that there is a flickering flame at the tip. And again, the temperature is equivalent to the surface temperature of the sun. Before I turn to the withdrawal issues, I'd like to also draw this Court's attention to the Carlick case. And Carlick involved the use of explosives to blow open bank depositories to remove money. Now, Mr. Eaton's counsel has said that the concern is that fire involves destruction. I think he said danger to human life. That is exactly what happened in Carlick. And that's exactly what happened here. And although Carlick deals with H1 with respect to explosives, if that falls under the statute, I submit to you that the damage and destruction and the fire that's used here is no different. And again, if that case, that case was not decided on the issue of 844-H1. But nonetheless, there doesn't seem to be dispute that that is a proper application of it. And so if that, if Carlick is a proper application, I submit to you that this is equivalent. How about Graham? I think, was it Graham case? Do you have a response to the Graham case? Graham, I think, identifies the issue well. I think it says, look, there are, you know, we, the Court has to draw lines. And the Graham judges said twice in the opinion, we are deciding only the case in front of us. And I think another distinction that should be made with Graham is that they weren't looking to sort of the parade of horribles of what could happen if they decided this. What they said was looking at 844-H1, if we read it the way that the government in that case had suggested, it would actually make another statute in Title 18 either superfluous or redundant, which is 924-C, because they said every time that you discharged a bullet as part of a crime, 844-H1, you would therefore, you automatically get the penalty that's already covered in 924-C. And so they read those two statutes, without going to legislative history, they read those two statutes as creating conflict. Here we don't have that conflict. There's nothing else saying that using 844-H1 on its own as set forth here causes a problem. I would also point out that Desposito, which was decided several months later, was decided by two of the same three judges as Graham. And they came to the conclusion that fire is not required. Burning a car that's parked in front of someone's house to make a distraction so you can go commit a bank is not fire under the model penal code and is not fire in the traditional understanding of that term. Again, the Fourth and Seventh Circuits have concluded the same with respect to cross-burning. So we are not tethered to arson. What we are tethered to is the use of fire. And this Court may at some point be called upon to make a difficult distinction. But the same way that if a bank robber came up to the bandit bearer with a glass and with a pistol tried just to simply break through the glass using it as a hammer, not as a firearm, the Court would be called upon to decide is that the use of a firearm to commit a felony or to commit a violent crime. But the fact that that situation exists doesn't mean that the mine-run cases of 924C or even slightly exotic cases of 924C can't be decided and the statute can't be enforced. If I may... Your theory is interesting that it's just about drawing a line. That's frequently the case I find. You draw lines. And then when you draw a line, you say, really, is this what's intended? And you could see somebody drawing a line right here, couldn't you? Well, drawing a line in which direction, Your Honor? Well, I don't know. Your Honor, I submit to you that this is an exotic tool. And that's one of the reasons that we haven't seen a case of this. You know, at the time of the briefing, there was one Federal case that even mentioned the word thermal lance. And all it said was it's a very dangerous tool. It's hard to use. It's hard to use for this purpose. You really have to know what you're doing or else, as Judge Molloy pointed out, all the money burns up. I certainly don't use it in order to start a fire. But you could, Your Honor. It could start... I could. But that's not really the purpose of this. No, but the reason you wouldn't use it to start a fire is because it has an oxygen tank this tall, a striker plate, a battery, a hose, which is, you know, and if you had a can of gasoline and a match, you could accomplish the same purpose. You wouldn't need to bring that entire equipment in. Under the appellant's reading, though, I submit to you, if someone took a thermal lance and set a Federal official on fire for the purpose of killing him, that would not be the use of fire to commit a felony. But if someone took a thermal lance and went to his woodshed and started his woodshed on fire for the purpose of intimidating him, that would be the use of fire. So I submit to you that the absurd results actually run in the other direction, that if you take away the hottest fire known to man, which here is being used to undeniably burn a substance to commit a felony, that you have therefore removed entirely this tool from the application of the statute. If there are no further questions on fire, I'll address briefly the withdrawal issues. Your Honor, please. First of all, on withdrawal, I think there... I don't think the... We're talking about conspiracy or aiding and abetting. That was exactly what I was going to get to, Your Honor. I don't think it was really discussed specifically. With respect to conspiracy, this is an overt act list conspiracy. And as a result, withdrawal does not apply. With respect to aiding and abetting, the Lothian case, in which the appellants hang a lot of their analysis, doesn't deal with this. Lothian mentions it in passing. I would submit to you its dicta. And Lothian has been brought into question by the Smith case. And the reason why is that to aid and abet, you must counsel, procure, aid, assist. But you have to do something. And once you've done that thing, you have aided or abetted. And once you've done that thing, you can't withdraw from doing that thing. So if Mr. Thompson brought the lance and delivered it, he's then aided and abetted. And there may be some circumstance under which Mr. Thompson could then go to the police or go to Mr. Eaton and forcibly tear the lance back out of his hands and take it back to Mr. Thompson's house. But once you've done that thing, you cannot withdraw. And so I submit to you that withdrawal on a legal basis was not appropriate to be given, certainly for conspiracy and certainly for aiding and abetting. Now, with respect to Mr. Dawson's claims about sufficiency, he said that he was there, he may have brought a hammer, and then he may have been in the area. There's far more than that. Mr. Dawson came to the Denny's restaurant Monday night. It's 24 miles from his house. He brought with him a large industrial tool, a hammer. While he was there, by the time he got to the area, until he left 4.30 the next morning, he made 45 calls back and forth to Mr. Eaton. Some of those calls were occurring as the initial bank larceny was taking place, as Mr. Williams was breaking in to disable the alarms, and then until the point that everyone left the area. Now, while he was at the Denny's, what did he do? He allowed a giant thermal lance to be transferred from someone else's car to the back of his truck. He was approached by police. What did he do? He lied. And then what happened? And this is a point that I don't think the appellant's counsel pointed out. That thermal lance made it from the back of Dawson's truck to the bank. Now, he either drove it there, or he permitted someone else to take it out of his truck, but he certainly facilitated that crime. Had he just truly gotten in his truck and driven home, the lance would have gone with him, and it would have ended up down in the South Bay, 20 miles away. But he didn't. He allowed that to be delivered to Eaton and Williams, who were at the bank. And then he left the area briefly, and the cell phone records show him coming back. Now, Ms. Fusilier pointed out that you can't be specific with the cell tower data. That is true. But if you look at the records, it shows that Mr. Dawson's cell phone was bouncing off of the same towers as was Mr. Eaton's cell phone. Mr. Eaton was undeniably inside of the bank. So they were both using the same towers. We'll never know exactly how far away he was or whether he was serving as a lookout or serving just to take the proceeds at the end, but he was there. Having the opportunity to leave, he could have left, but he didn't. He stuck around until the crime was complete, all the while talking to Mr. Eaton. As to Mr. Thompson, I think the evidence is even stronger. He came to the bank or, sorry, to the Denny's with the Thermal Lance and with walkie-talkies. Both of the walkie-talkies and the Thermal Lance were used to commit the crime. He certainly aided and abetted that. There was testimony that he left, but there was also testimony from Mr. Williams that Thompson stayed and served as a lookout, picked them up after the crime was complete, and then went back to Eaton's house to dispose of their soiled clothing and to collect the proceeds. Reading the evidence most favorable to the government, there's no doubt that there was sufficient evidence on that regard. Unless the Court had any further questions. Thank you. Your Honors, I'll be brief. I just had three quick points that I wanted to make. First of all, the government does characterize this lance cutter as an exotic tool. I think they're mistaken. There's a law on the books, on the state books, that's been around for 80 years, essentially, that covers the use of a signaling torch or, in 1969, a thermal lance cutter. There was testimony at trial by Detective Black that this lance cutter is commonly used in bank larcenies. I think the exotic situation is the first time that the government has ever charged this lance cutter in a federal case with a 10-year mandatory minimum. So I don't think that that's an accurate reading of either the law or the record. I think the more important point is the government still hasn't drawn a line. I think they're clearly getting much more aggressive in charging this 10-year mandatory minimum, and the courts are starting to step in, as I think the Graham case is an example of doing just that. There's some talk about the dicta that's in Hayward about this facilitating versus using the actual fire or explosive to commit the felony. I think the problem that we get to with that is that, first of all, that's not what the court relied on in Hayward. I think the other point is that we can imagine a number of devices that would do the exact same thing as the lance cutter. There are lasers. There are high-pressure water jets that can cut through metal. The government's only sort of hook here is that this thing is very hot. This lance cutter is very hot and that it can melt through metal. But clearly hasn't drawn a line as to the application of this statute with all of the other examples that have been given and with the example that Your Honor gave in terms of manufacturing methamphetamine. Kennedy. What do you make of his hypothetical about using this thermal device to burn a man alive, but that wouldn't be the use of fire? I think it would be. I think we're talking about two different situations. I think the first argument that we're making is that this isn't fire. The second argument is we're talking about all the things that go along with creating fire and a situation where somebody is deliberately using fire to accomplish the means of their objective and there's no dispute in that case that this person was burned alive, that's how we think of fire. That's how we think of arson cases, as people's lives being threatened, as people's lives being in danger. And that's actually how arson is defined in the federal statutes. There's a sentencing classification for arson in 3559, which says that arson is the maliciously damaging or destroying any building, inhabited structure, vehicle, vessel, or real property by means of fire and explosive. And there's an affirmative defense to that saying that it's not arson if the offense posed no threat to human life. The example that the government gave clearly there's a threat to human life. The entire means of committing the offense is to threaten human life. And lastly, I just want to just briefly say that Carlick is exactly the situation that we have been talking about all along. Carlick was a situation where the defendant in that case blew up a bank, and the government charged arson in that case, and the defendants were found guilty of arson in that case. Thank you. Thank you, Counsel. The case is argued to be submitted.
judges: Molloy, Reinhardt, Murguia